In the

# United States Court of Appeals
## For the Seventh Circuit

―――――――――――

No. 22-2740

ANNA KINNEY,

*Plaintiff-Appellant,*

*v.*

ST. MARY'S HEALTH, INC., doing
business as ST. VINCENT EVANSVILLE,

*Defendant-Appellee.*

―――――――――――

Appeal from the United States District Court for the
Southern District of Indiana, Evansville Division.
No. 3:20-cv-00226-RLY-MPB — **Richard L. Young**, *Judge.*

―――――――――――

ARGUED APRIL 4, 2023 — DECIDED AUGUST 7, 2023

―――――――――――

Before EASTERBROOK, WOOD, and HAMILTON, *Circuit
Judges.*

HAMILTON, *Circuit Judge.* Plaintiff Anna Kinney began
working as director of imaging services at St. Vincent Hospital in Evansville, Indiana, in 2016. Her employer approved her
2018 request for intermittent medical leave due to anxiety.
Like many other employees across the world, Kinney began
working remotely in March 2020 because of the COVID-19

pandemic. When safety protocols were developed, her co-
workers returned to work in person at the hospital. Kinney
did not. She kept working remotely without asking permis-
sion or notifying her supervisor of her decision to remain at
home full time. She asserts that she could not wear a mask or
other face covering in compliance with the hospital's COVID-
19 protocol because face coverings exacerbate her anxiety.
When her absences from the hospital led to complaints and
questions about her job performance, hospital management
told Kinney that she had to return to work on site at least sev-
eral days each week. Kinney submitted a doctor's note re-
questing that she be allowed to work solely from home to
avoid having to wear a mask in the hospital. Management de-
nied this request and a later request for accommodations, and
Kinney eventually resigned.

Kinney sued the hospital under the Americans with Disa-
bilities Act, 42 U.S.C. § 12101 et seq. ("ADA"), alleging that the
employer failed to accommodate her disability, discriminated
against her by denying her requested accommodation and
constructively discharging her, and retaliated against her
with the constructive discharge. Kinney also brought claims
under Title VII of the Civil Rights Act of 1964, 42 U.S.C.
§ 2000e et seq., alleging a hostile workplace, discrimination
based on her sex in failing to select her for several promotions,
and retaliation in the form of constructive discharge. Kinney
also brought a retaliation claim under the Family and Medical
Leave Act, 29 U.S.C. § 2601 et seq. The district court granted
summary judgment for the hospital on all claims.

Kinney appeals, challenging summary judgment on her
ADA claims as well as her failure-to-promote and retaliation
claims under Title VII. She does not challenge the district

court's ruling on her hostile work environment or FMLA claims. We affirm on all counts. No reasonable juror could find that Kinney could perform certain essential functions of her job without being present in the radiology department that she oversaw. Kinney thus was not a qualified individual for the job under the ADA and, even if she had been, the accommodation she requested was not reasonable. Her eventual resignation also was not a constructive discharge. Kinney's sex discrimination claims were pared down to two promotions she sought unsuccessfully. For one promotion she did not show a genuine factual issue as to whether the employer's reason for hiring the selected candidate was pretextual. For the other, Kinney's evidence did not raise a genuine factual issue as to whether she was similarly or better qualified for the position than the chosen male candidate.

I.   *Factual and Procedural Background*

A.  *Kinney's Disability and Accommodation Issues*

Defendant St. Mary's Health, Inc. (doing business as St. Vincent Evansville) hired Anna Kinney in May 2016 as the executive director of imaging services. She supervised approximately 120 employees in the radiology department. Her job description summarized the position as responsible for planning, administering, monitoring, and evaluating the delivery of imaging services to patients. Though Kinney did not directly provide medical services to patients in this position, she was required to monitor the "plan for patient care services" and to be a "liaison between the radiologists, radiology residents, chairperson, radiology staff and other department leaders." She also oversaw the installation and maintenance of equipment "to promote efficiency, health, comfort and safety of patients and staff." The job description said that the

position required "using personal protective equipment as required."

Kinney was diagnosed with attention-deficit/hyperactivity disorder and an anxiety disorder in 2015 and post-traumatic stress disorder in 2017. She applied and was approved for intermittent FMLA leave in 2018. She used only one or two days of leave from October 2018 through December 2020.

On March 15, 2020, hospital management instructed Kinney and many other employees to work remotely as the spreading COVID-19 virus became a pandemic. Kinney began working remotely, going to the hospital two or three times a month. She stopped going on site at the beginning of August 2020 because the hospital required that everyone inside wear a mask. Kinney contends she is unable to wear a mask because of her anxiety.

Kinney and other department heads were supervised by John Greaney, the vice president of operations. He testified that all department heads aside from Kinney returned to in-person work. Kinney did not tell Greaney that she planned to work solely from home beginning in August, nor did she ask for permission to do so. After receiving multiple complaints from staff about Kinney not being present at the hospital, Greaney told Kinney on October 23, 2020 that she needed to work in person at least a few times a week. When Kinney told Greaney that she could not wear a mask, he initially thought that the inability stemmed from a recent eye surgery. In response, Greaney suggested a plastic face shield and reached out to the hospital's supplier of personal protective equipment to try to find a mask that would not cause irritation. On October 29, 2020 Kinney obtained a note from her physician

saying that she could not wear a mask due to anxiety and recommending that she work entirely from home, if possible.

Greaney asked Kinney to speak with her physician about the possibility of wearing a face shield instead of a mask. Kinney testified that she explained to her doctor that a face shield caused the same problems as a mask, but she never communicated this information to Greaney or anyone else in management, nor did she obtain a verifying physician note. Having received no response about the possibility of wearing a face shield, the hospital told Kinney that she needed to return to work in person effective December 7, 2020. She sent Greaney an email asking for clarification about this requirement. He responded that a physical presence was required for her position. It is unclear from the record whether Kinney began going into the hospital at this point.

On January 12, 2021, Kinney submitted a second physician note. The note again requested that Kinney be able to work remotely, but with an alternative allowing for in-person work two days a week for six hours each day "perform[ing] as many of her responsibilities as possible in her office using remote technology so that mask wearing is kept to a minimum." Kinney's physician also said that situations requiring mask wearing "should be limited as much as possible to time frames near 15 minutes each or as tolerated." The next week, Kinney showed up to the hospital and attended an in-person staff meeting without a mask. She was reprimanded by Greaney for failing to follow the hospital's COVID-19 precautions. Kinney's second request for accommodation was denied.

From January 2021 through May 2021, Kinney worked in person two days a week, spending most of her time in her

office with her door closed without a mask. She took intermittent FMLA leave and used accrued paid time off to cover the remaining three workdays each week. Kinney filed a charge of discrimination with the Equal Employment Opportunity Commission on March 8, 2021 alleging that the requirement that she come to the hospital to work discriminated against her on the basis of her disabilities.

Once Kinney ran out of FMLA leave, she took a leave of absence beginning in May 2021. That leave was scheduled to end August 9, 2021. On August 1, 2021, Kinney wrote to Greaney that she had visited her doctor and intended to return to work on August 9. Without further communication with Greaney, Kinney resigned rather than return to work. Kinney filed another charge of discrimination with the Equal Employment Opportunity Commission on September 28, 2021 with the same allegation of discrimination for being required to work in person.

B.  *Title VII Claims on Promotions Denied*

While working as director of imaging services, Kinney applied for various promotions within the larger hospital system. She was not selected for any. On appeal she challenges the grant of summary judgment on her claims based on two of those positions.

First, Kinney applied for the Warrick County Hospital administrator position in January 2019. The hospital worked with a recruiter to choose six qualified candidates to interview, including Kinney. She was not selected as one of the two finalists who were interviewed by a board member, a physician, and a nurse leader for the hospital. That panel interviewed the two finalists, one male and one female, and

chose the male candidate for the position. The chosen candidate had been serving as interim hospital administrator at the Warrick County Hospital.

On September 12, 2019, Kinney wrote a letter to the hospital alleging sex discrimination, including for not being selected for the Warrick County Hospital administrator position. The hospital formally investigated the complaint and found the claims unsubstantiated. On December 5, 2019 Kinney filed a charge of discrimination with the Equal Employment Opportunity Commission alleging retaliation as well as discrimination on the basis of gender and disability.

Second, Kinney applied to be vice president of finance for the larger St. Mary's Health System in 2019. Job requirements for that position included education and experience related to finance and accounting. Kinney has experience in healthcare management that includes tasks like budgeting, but none of her prior positions were focused on finance. She does not have an educational background in finance or accounting. She has a bachelor's degree in health management and a master's degree in healthcare administration. The hired male candidate had a bachelor's degree in accounting and finance and a master's degree in business administration. He was also a certified public accountant with five years of experience in the finance department of this hospital.

### C.  District Court Proceedings

Kinney filed this suit against the hospital on September 28, 2020 and eventually added several other claims that accrued while the suit was pending. After discovery, the hospital moved for summary judgment on all claims. The district court granted the motion on all claims in a careful memorandum

opinion. *Kinney v. St. Mary's Health, Inc.*, No. 3:20-cv-00226-RLY-MPB, 2022 WL 4745259 (S.D. Ind. Aug. 31, 2022). Kinney appeals the grant of summary judgment on her ADA claim and her Title VII claims for failure to promote because of her sex.

II.  *Analysis*

We review de novo the district court's grant of summary judgment, evaluating all conflicting evidence in the light most favorable to Kinney while also giving her the benefit of any reasonable inferences from the evidence in her favor. *Ziccarelli v. Dart*, 35 F.4th 1079, 1083 (7th Cir. 2022). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if a reasonable juror could look at the evidence and return a verdict for the non-moving party. *Brown v. Advocate South Suburban Hospital & Advocate Health & Hospitals Corp.*, 700 F.3d 1101, 1104 (7th Cir. 2012).

A.  *ADA Claim for Failure to Accommodate*

The ADA provides employment protections to individuals with disabilities who can perform the essential functions of a job so long as their employer makes a reasonable accommodation for them. 42 U.S.C. § 12111(8). Plaintiff Kinney sought to be excused from doing her work in person with a face mask for protection of herself and others from infection. When an employee seeks to be excused from complying with an employer's safety requirement, courts can look at the issue in a couple of different ways, both in terms of whether the employee is qualified to do the work and whether a particular proposed accommodation would be reasonable. See generally

*Mlsna v. Union Pacific RR. Co.*, 975 F.3d 629, 633 (7th Cir. 2020) (reversing summary judgment where railroad conductor sought to be excused from wearing employer's standard hearing protection devices, which prevented conductor from passing hearing acuity test).

Under the ADA, an employee who cannot comply with a valid safety requirement for her position will "not be considered 'qualified.'" EEOC, Applying Performance and Conduct Standards to Employees with Disabilities, 2008 WL 4786697, at ¶ 23 (Sept. 25, 2008) (being unable to comply with a dress requirement that is "job-related and consistent with business necessity" renders person not qualified, giving example of wearing steel-toed boots). As with all reasonable accommodation cases, we do not merely accept the employer's assertion that the claimed job requirement is in fact essential. We must ask whether a reasonable accommodation would allow the employee to perform her job in compliance with legitimate safety requirements. This was the approach laid out in a well-reasoned (though nonprecedential) decision by the Fourth Circuit. *Holmes v. General Dynamics Mission Systems, Inc.*, 835 Fed. Appx. 688, 691–92 (4th Cir. 2020) (affirming summary judgment for employer where employee could not wear steel-toed boots due to disability; fact that plaintiff had worked without such boots for years without incident did not render her a qualified individual).

Like the plaintiff in *Holmes*, Kinney does not dispute that the employer's safety protocol at issue was a valid job requirement. In fact, Kinney's job description contained a requirement of "using personal protective equipment as required." This job requirement implied that the employee would need to work in person in hospital settings that require wearing

protective equipment for the health and safety of employees
and patients. Kinney does not suggest that there is a reasona-
ble alternative face covering that would allow her to achieve
the purpose of the safety requirements. She asserts instead
that she could perform all of her job duties remotely. But as
we explain next, the uncontested testimony of her colleagues
shows that she could not perform her duties satisfactorily
while working remotely. When COVID-19 safety precautions,
including wearing a mask in the hospital, went into place, it
became apparent that Kinney was not a qualified individual
for her position and that she was seeking an accommodation
that would not be reasonable under the circumstances. She
was not able or willing to perform the in-person work that
was essential to her position while wearing the personal pro-
tective equipment that her job required.

The parties and district court frame the main issue in this
case as whether working in person was an essential function
of Kinney's job. This framing tracks our case law on working
from home as an accommodation, which approaches the
question at a high level of generality. Our precedents have
generally disfavored working from home because such an ar-
rangement makes teamwork and supervision of productivity
difficult. But considering whether working in person is an
"essential function" can invite too much reliance on generali-
ties about the obvious benefits of physical presence in a work-
place, losing sight of a specific job and specific arrangements
and accommodations. It may be helpful to frame the issue as
whether essential functions of the job must be performed in
person, such that allowing the employee to perform those
functions from home would not be a reasonable accommoda-
tion. The analysis needs to focus on the specific job and its es-
sential functions and specific possible accommodations.

To determine whether a particular job function is essential, courts consider written job descriptions, the consequences of not requiring that the function be performed, and the work experience of employees in similar jobs, among other factors. 29 C.F.R. § 1630.2(n)(3) (listing factors); see also 42 U.S.C. § 12111(8); *Tate v. Dart*, 51 F.4th 789, 794 (7th Cir. 2022). We consider and respect an employer's opinion about whether a function is essential, but we do not give the employer's view complete deference. *Tonyan v. Dunham's Athleisure Corp.*, 966 F.3d 681, 687–88 (7th Cir. 2020).

In older cases on working from home as an accommodation, this court has focused less on particular facts to see whether a certain job required tasks that must be performed in person and more generally on why attending work in person is "a basic requirement." *Waggoner v. Olin Corp.*, 169 F.3d 481, 484–85 (7th Cir. 1999).[1] More than twenty-five years ago, we even said generally that "an employer is not required to accommodate a disability by allowing the worker with a disability to work, by himself, without supervision, at home … where their productivity inevitably would be greatly reduced. … [I]t would take a very extraordinary case for the employee to be able to create a triable issue of the employer's failure to allow the employee to work at home." *Vande Zande v. Wisconsin Dep't of Admin.*, 44 F.3d 538, 545 (7th Cir. 1995). Working from home has been disfavored in ADA cases "because most jobs require the kind of teamwork, personal interaction, and supervision that simply cannot be had in a home office situation." *Rauen v. United States Tobacco Mfg. Ltd. P'ship*, 319 F.3d 891, 896 (7th Cir. 2003). As recently as 2008 we

---

[1] A different holding in *Waggoner* regarding short-term impairments was later superseded by the 2008 amendments to the ADA.

repeated that, "as a general matter, working at home is not a reasonable accommodation." *Mobley v. Allstate Ins. Co.*, 531 F.3d 539, 547–48 (7th Cir. 2008).

But even a few months before the COVID-19 pandemic forced many workers to work from home, we noted that technological advances have made working from home more feasible, so that employers cannot rely on an automatic presumption working from home is unreasonable. *Bilinsky v. American Airlines, Inc.*, 928 F.3d 565, 573 (7th Cir. 2019). The many lessons learned about working from home effectively during the pandemic have reinforced that point. The crux of Kinney's argument for why she should have been allowed to work from home is that she and many of her co-workers did so beginning in March 2020. The fact that many employees were able to work remotely temporarily when forced to do so by a global health crisis does not mean that those jobs do not have essential functions that require in-person work over the medium to long term. Determining whether a specific job has essential functions that require in-person work has become much more of a case-specific inquiry.

Here, Kinney's job description said that the position required evaluating staff in the department and serving as a "liaison between the radiologists, radiology residents, chairperson, radiology staff and other department leaders." The position also required overseeing proper functioning of sophisticated medical imaging equipment and ensuring that facilities and equipment were maintained "to promote efficiency, health, comfort and safety of patients and staff."

Kinney maintains that she could perform these tasks effectively from home. She admitted, however, that her doing so would require someone else to do the on-site monitoring and

evaluation of ongoing activities within the department. She testified that she could get her job's required supervision tasks done by relying on reports about staff and equipment from others, and the record indicates that that was the approach Kinney took. As one person she supervised testified, Kinney "depends on us to let her know if we have any issues." But having "another employee perform a position's essential function, and to a certain extent perform the job for the employee, is not a reasonable accommodation." *Majors v. General Electric Co.*, 714 F.3d 527, 534 (7th Cir. 2013). Of course, other employees would sometimes report personnel or equipment issues to Kinney, but the position required her to play an active role in noticing and addressing issues as a department supervisor. As a manager testified, all leaders including Kinney were "expected to be on campus every day and … continually walk around to make sure everything is functioning properly." Kinney could not accomplish this work when she was at home or if she came to the hospital but remained alone in her office.

Numerous employees whom Kinney supervised in the radiology department complained that her absence affected her performance and the department more broadly. One manager testified that employees who reported to Kinney repeatedly complained to her, saying they "don't feel that [Kinney] supports them. She doesn't interact with them. She doesn't know many of them by name." The same manager also testified that although she did not have trouble reaching Kinney while she worked from home, Kinney's not being present was an issue because "I was doing everything here and fielding all the phone calls and doing more than my load." Based on this testimony, there were essential job duties that Kinney was not performing while at home.

Other employee testimony showed that Kinney's physical absence affected the staff she was required to supervise. The staff did not "see [Kinney] very much," which affected "confidence that you get from staff when they actually have a relationship with the director of radiology …. Previous directors have gone to the various departments and talked with the staff, checked in on them … [to] see how their daily operations were going and just made a visual and a personal connection to say, hey, I'm here if you need me." This expectation from staff for a connection and communication with Kinney fit with her job description listing her as the liaison between imaging staff and hospital leadership.

Additionally, Kinney's supervisor testified that her role required her to work in person. We do not defer blindly to this judgment, e.g., *Brown v. Smith*, 827 F.3d 609, 613–14 (7th Cir. 2016) (affirming jury verdict for plaintiff and noting that actual job's performance undermined job description requirement to obtain a certain class of driver's license), but here we agree with it because it is supported by Kinney's own admission that she was relying on reports from others to perform her supervisory roles as well as by evidence of how her not working in person affected her performance in essential functions of her job. As is clear from Kinney's job description, her manager's assessment, and the way that staff described her performance, she could not perform the essential functions of supervising the radiology department and acting as a liaison without being in person, and not just alone in her office, for a significant portion of her workweek.

It was also apparent from Kinney's requested accommodations that no reasonable accommodation would have allowed her to fulfill the in-person duties of her job without

endangering herself and others. Kinney did not respond when her supervisor asked her to consider wearing an alternate type of face covering. Her accommodation requests were not reasonable because they would not have enabled her to perform the job duties that required her to be in person. Kinney initially requested to work entirely from home. She later amended her request to work in person two days a week for six hours each day, but "perform[ing] as many of her responsibilities as possible in her office using remote technology so that mask wearing is kept to a minimum." Her doctor wrote that mask wearing "should be limited as much as possible to time frames near 15 minutes each or as tolerated."

This requested accommodation would not have enabled Kinney to perform the essential functions of her job. Even if she had received her requested accommodation and had gone to the hospital two days a week, she was still asking to avoid performing the supervisory and liaison tasks that required being in person, moving through her department, and interacting with staff. The request was not for a reasonable accommodation because it would have allowed Kinney to avoid performing tasks essential to her job rather than helped her to accomplish them. See *Majors*, 714 F.3d at 535 ("The accommodation [sought]—another person to perform an essential function of the job [plaintiff] wants—is, as a matter of law, not reasonable."). In sum, the district court correctly granted summary judgment on Kinney's ADA claims.

B. *Title VII Claims for Failure to Promote*

Under Title VII, an employer may not fail to promote an individual because of that person's sex. 42 U.S.C. § 2000e-2(a)(1). Kinney presents her failure-to-promote claims using the burden-shifting framework of *McDonnell Douglas Corp. v.*

*Green*, 411 U.S. 792 (1973), which is one way to prove such a claim. See, e.g., *Logan v. City of Chicago*, 4 F.4th 529, 536–37 (7th Cir. 2021). To use that method of proof, a plaintiff must first offer evidence that she was (1) a member of a protected class, (2) qualified for the position, (3) rejected for the position, and (4) that the employer selected someone outside the protected class who was similarly or less qualified. *Id.* If the plaintiff makes out a prima facie case by meeting each of these elements, the burden shifts to the defendant to articulate (not to prove) a legitimate, nondiscriminatory reason for the promotion decision. *Id.* If the employer meets that burden, then the burden shifts back to the plaintiff to offer evidence that the given explanation is pretextual, meaning not merely wrong but false. If it was false, a trier of fact may infer that the real motive for the decision was unlawful. The district court granted summary judgment for the employer on both of Kinney's claims for failure to promote.

First, as for the Warrick County Hospital administrator position, the district court found that Kinney failed to offer evidence either that she was better qualified for the position than the hired applicant or that the reason given for selecting another candidate was pretextual. To be pretextual, the reason must be "a lie, specifically a phony reason for some action." *Chatman v. Board of Educ. of Chicago*, 5 F.4th 738, 746 (7th Cir. 2021), quoting *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995). We agree that Kinney failed to offer evidence of pretext and affirm on that ground.

We assume for purposes of argument that a reasonable juror could find that Kinney and the chosen candidate were at least similarly qualified. See *Runkel v. City of Springfield*, 51 F.4th 736, 744 (7th Cir. 2022). Kinney has well over a decade

of experience serving in senior healthcare administration positions. A recruiter screened all applicants, conducted preliminary interviews, and recommended six candidates for interviews, including Kinney. She appeared to be qualified for the position, although we cannot and need not decide which candidate was best qualified.

The employer offered a legitimate, nondiscriminatory reason for the hiring decision. Kinney's evidence in response falls short of showing a genuine question as to whether that reason was pretextual. The employer said it chose another candidate because he had relevant experience and superior interview performance, which can be a legitimate nondiscriminatory reason for hiring. See, e.g., *Groves v. South Bend Community School Corp.*, 51 F.4th 766, 771 (7th Cir. 2022) (fact that plaintiff's interview "did not go well" was subjective determination yet "entirely proper, especially given the absence of anything in the record suggesting that considerations of [the plaintiff's membership in a protected class] influenced" the hiring decision). To avoid summary judgment on this claim, Kinney needed to raise a question of fact as to whether the justification was an honest explanation for the hiring decision. See *Mullin v. Temco Machinery, Inc.*, 732 F.3d 772, 778 (7th Cir. 2013). She has not done so.

The interview process here does not suggest that an applicant's sex played a role in decision making. Kinney did not progress to the final round of interviews; another female candidate did. Kinney's primary argument for pretext is that her supervisor, Greaney, exhibited bias against her because of her sex. This argument fails out of the gate because the undisputed facts show that Greaney did not conduct her interview. Kinney provides no reason to believe that the person who

actually interviewed her and described her performance in that interview as poor was biased against her because of her sex. No reasonable juror could look at Kinney's evidence and find that the employer's interview-based reason for choosing a different candidate was pretextual.

Second, moving on to the position as vice president of finance, the district court found that Kinney did not show that she was similarly or better qualified for the position than the chosen candidate, so she did not establish a prima facie case. We agree. The job required both an education and work experience in finance. Kinney argues that she was more qualified because she had held her master's degree for longer and had more leadership experience. But there is no doubt that the chosen candidate had more directly relevant credentials and experience in finance than Kinney did. His bachelor's degree was in accounting and finance while hers was in health management. He was a certified public accountant while she was not. He had years of experience working in the same hospital system's finance department, while none of Kinney's positions were in a finance department or focused on finance. Her deposition testimony about her relevant finance experience said she had made decisions "that had a large financial impact—positive financial impact for the organization." There is not sufficient evidence to create a genuine issue of material fact as to whether Kinney was similarly or better qualified for a position in finance than the person hired. The district court correctly granted summary judgment on the promotion claims, too.

C. *Constructive Discharge Claims*

Three of Kinney's claims remain: discrimination under the ADA, retaliation under the ADA, and retaliation under Title

VII. These three claims all share as a common element that the plaintiff suffered an adverse employment action. *Rowlands v. United Parcel Serv.*, 901 F.3d 792, 801 (7th Cir. 2018) (ADA retaliation); *Burton v. Board of Regents*, 851 F.3d 690, 695 (7th Cir. 2017) (Title VII retaliation); *Dickerson v. Board of Trustees*, 657 F.3d 595, 601 (7th Cir. 2011) (ADA discrimination under the indirect method of proof, the method used by Kinney here). The district court correctly held that Kinney did not offer evidence of an adverse employment action. All three claims fail on that basis.

Kinney argues that the adverse employment action she suffered was being constructively discharged from her position. That approach can work in theory. *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010), citing *Pennsylvania State Police v. Suders*, 542 U.S. 129, 147 (2004). This circuit recognizes two methods for proving constructive discharge. The first requires "a discriminatory work environment even more egregious than the high standard for hostile work environment." *Scaife v. United States Dep't of Veterans Affairs*, 49 F.4th 1109, 1119 (7th Cir. 2022), quoting *Fischer v. Avanade, Inc.*, 519 F.3d 393, 409 (7th Cir. 2008). The second requires the plaintiff to show that "she was forced to resign because her 'working conditions [became] so intolerable that a reasonable person would have felt compelled to resign.'" *Id.*, quoting *Stamey v. Forest River, Inc.*, 37 F.4th 1220, 1225 (7th Cir. 2022).

Kinney argues that she suffered constructive discharge because her employer "was aware that by intentionally denying [her] accommodation, her employment would end because [she] would be forced to choose between her job or her health." As we explained above, however, the employer acted within its rights in denying Kinney's accommodation request.

Honoring her request would have prevented her from performing the essential supervisory and liaison functions of her job. Additional undisputed facts also undermine Kinney's claim of constructive discharge. She told her supervisor in writing that she had spoken to her doctor and would be returning to work after her medical leave period ended in August 2021. She did not suggest a new accommodation, nor did she indicate that she could return only with accommodations or express any reservation about returning to work. Kinney never communicated to the employer that she had changed her mind before resigning. These facts do not support a finding of constructive discharge. Kinney has not offered evidence that she suffered an adverse employment action, so summary judgment for the employer was proper on her claims of discrimination under the ADA and retaliation under both the ADA and Title VII.

The judgment of the district court is AFFIRMED.